


IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| CHRISTOPHER D. ALEX, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:11cv1207 (LMB/IDD) |
| ) | |
| RAY MABUS, ) | |
| Secretary, Department ) | |
| of the Navy Agency, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Before the Court is defendant Secretary of the Navy Ray Mabus' Motion to Dismiss in Part and for Judgment on the Pleadings in Part [Dkt. Nos. 26 & 27]. For the reasons discussed below, defendant's motions will be granted and this civil action will be dismissed.

### I.  BACKGROUND

Plaintiff Christopher Alex is an at-will truck driver employed by Doss Aviation, a contractor for the United States Navy, and is stationed at Naval Support Activity Souda Bay ("NSA Souda Bay"), on the island of Crete, Greece. EEO Report at 4.[1]

---

[1] Plaintiff filed an EEO complaint on October 26, 2009, alleging that the Navy had discriminated against him based on his Greek Orthodox religion and that his First Amendment rights were violated. The EEOC dismissed his complaint because Alex was not an employee of the Navy and affirmed this decision on appeal and upon Alex's request for reconsideration.

Plaintiff has resided in the city of Xania[2] since 2003 and has worked for Doss Aviation since June 1, 2005. Id.; Pl.'s Sealed Status Report at 1 [Dkt. No. 44]. Upon his arrival in Crete, plaintiff, who practices Greek Orthodox Christianity, volunteered for Fronditha (Helps) Christian Ministries, which at the time served the poor, many of whom were foreigners, out of a building in Xania. EEO Report at 4; Pl.'s Status Report at 3 [Dkt. No. 43]; Pl.'s Sealed Status Report at 1. Beginning in the spring of 2009, plaintiff and his family commenced the activity at issue in this lawsuit, the operation of a ministry in a public Xania square. The group hands out "clothes, food and bibles to any person who desires to receive them," and, more recently, plays and sings music as well. EEO Report at 4; see also Mem. Supp. Def.'s Mot. Dismiss in Part & for J. on Pleadings in Part ("Def.'s Mem.") Ex. 1 (Letter to J. Sullivan, S.D.N.Y.) (parties are in agreement that Alex's public religious activities involved "feed[ing] and cloth[ing] the poor and the homeless, spiritual music, public spiritual encouragement and exhortation, and finally giving out the New Testament to those who want one in their language"). According to plaintiff, the

---

Plaintiff's complaint does not itself include substantial factual allegations, but it references and attaches the EEO Counselor's Report dated November 6, 2009 ("EEO Report").

[2] The spelling of the city's name varies between "Chania" and "Xania."

2

ministry has received "overwhelming positive responses" from the local community. Pl.'s Opp'n at 3 [Dkt. No. 30].

On May 19, 2009, plaintiff received a telephone call from John Kennedy, his supervisor at Doss Aviation. Kennedy informed plaintiff that, per the request of NSA Souda Bay, plaintiff should discontinue his ministry activities. EEO Report at 4. Plaintiff responded that "his off duty activities are not the business of Doss Aviation or NSA Souda Bay." Id. at 5. The next day, plaintiff participated in a meeting with Kennedy and Christopher Engels, Command Master Chief at NSA Souda Bay. Id. Plaintiff again stated that his off-duty activities "should not be the concern of his employer." Id. The meeting apparently became heated, as Engels allegedly stated that he would "not have my sailors coerced into breaking the law by anybody," to which plaintiff responded that he was the person being harassed. According to plaintiff, NSA Souda Bay contacted Doss Aviation in an attempt to end plaintiff's activities. Id.

On May 22, 2009, plaintiff received a cease and desist letter from Captain T. J. McDonough, Jr., the commanding officer of NSA Souda Bay. The letter stated in part:

> 1. I have been informed that you have engaged in religious activities consistent with proselytizing in Chania. Greek Law specifically prohibits these activities. As a member of the United States Forces in Greece, your activities have violated bilateral agreements between the United States and Greece, and

3

> these activities jeopardize host nation relations and may affect the United States mission.
>
> 2. This command is committed to supporting religious activities for United States forces; however, we must comply with applicable law. Before engaging in off-base, public religious activities, you must consult with LT Steven Gonzales, Staff Judge Advocate, or LT Harry Hansen, Chaplain, at harry.hansen@eu.navy.mil.
>
> 3. This letter is an order directing you not to engage in any public activities consistent with proselytizing, or that may appear to be proselytizing, within the Greek territory. Failure to comply with this order may result in administrative and/or disciplinary action. Moreover, a violation of this order may result in prosecution under United States Law.

Soon after receiving the cease and desist letter, plaintiff visited Lieutenant Gonzales "to express his concerns about the letter," and stated that his group was not proselytizing. EEO Report at 5. Lieutenant Gonzales reemphasized that off-base activity must be pre-approved. Despite the events underlying this lawsuit, and the cease and desist letter in particular, plaintiff has continued with his ministry since 2010. Pl.'s Opp'n at 3.

Plaintiff filed this civil action against Secretary of the Navy Ray Mabus ("the Navy") in the United States District Court for the Southern District of New York, alleging a violation of his First Amendment rights.[3] The action was subsequently

---

[3] Plaintiff originally brought claims for religious discrimination under Title VII of the Civil Rights Act of 1964

4

transferred to this district. After hearing oral argument, the Court deferred ruling on defendants' motions to dismiss and for judgment on the pleadings and ordered the parties to engage in limited discovery on two matters: (1) whether, since May 22, 2009, other persons associated with the United States military at Naval Support Activity Souda Bay, Greece have participated in plaintiff's ministry or other similar public religious activities and, if so, the Navy's response to such activities; and (2) the manner in which the term "proselytism" has been defined and interpreted under Greek and European Union law. This Memorandum Opinion incorporates the results of that discovery.

## II. DISCUSSION

A. Standard of Review

**1. Fed. R. Civ. P. 12(b)(6) and 12(c)**

In considering a motion under Rule 12(b)(6) or Rule 12(c), the Court must assume that the allegations in the non-moving party's pleadings are true. Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). However, that requirement applies

---

and for a violation of his First Amendment rights, and sought $5,000 to reimburse a Greek attorney who prepared a legal brief on his behalf.

Agreeing with the EEOC that he is not an employee of the Navy, plaintiff has since abandoned his Title VII claim as well as his request for attorneys' fees, and the Court has dismissed these counts. As this litigation has progressed, plaintiff now contends that his rights under Greek and European Union law have also been violated.

5

only to facts, not to legal conclusions. Ashcroft v. Iqbal, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In addition, "if the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." Id. at 679. "Factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Accordingly, a party must "nudge[] their claims across the line from conceivable to plausible" to survive a Rule 12(b)(6) motion to dismiss. Id. at 570.

A motion for judgment on the pleadings under Rule 12(c) differs from Rule 12(b)(6) only as to timing. The former is filed "after the pleadings are closed" whereas the latter may be filed in response to a complaint. Zhang v. Rolls-Royce, Seaworthy Sys., No. 1:11cv942, 2012 U.S. Dist. LEXIS 933, at *8 (E.D. Va. Jan. 5, 2012). When deciding a Rule 12(c) motion for judgment on the pleadings, courts apply the same standard used to evaluate a motion to dismiss pursuant to Rule 12(b)(6). Burbach Broad. Co. v. Elkins Radio Corp., 278 F.3d 401, 405-06 (4th Cir. 2002). Accordingly, "[j]udgment should be entered when the pleadings, construing the facts in the light most favorable to the non-moving party," indicate that the dispute

6

"can . . . be decided as a matter of law." O'Ryan v. Dehler Mfg. Co., 99 F. Supp. 2d 714, 718 (E.D. Va. 2000).

### 2. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the record in the light most favorable to the nonmoving party. See Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002). The moving party must initially show the absence of a genuine dispute of material fact, and once it has met its burden, the nonmovant "must come forward and show that a genuine dispute exists." Arrington v. ER Williams, Inc., No. 1:11cv535, 2011 U.S. Dist. LEXIS 144909, at *11-12 (E.D. Va. Dec. 16, 2011) (Cacheris, J.) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) and Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Accordingly, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be

insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," summary judgment is appropriate. Matsushita, 475 U.S. at 587.

B. Applicable Law

As a contractor for the Navy, plaintiff's rights and duties are governed by the North Atlantic Treaty Organization Status of Forces Agreement ("NATO SOFA" or "SOFA") and the Mutual Defense Cooperation Agreement Between the Government of the United States of America and the Government of the Hellenic Republic ("MDCA"), to which both Greece and the United States are parties. The NATO SOFA provides that

> It is the duty of a force and its civilian component and the members thereof as well as their dependents to respect the law of the receiving State, and to abstain from any activity inconsistent with the spirit of the present Agreement, and, in particular, from any political activity in the receiving State. It is also the duty of the sending State to take necessary of [sic] measures to that end.

NATO SOFA Art. II. The MDCA supplements the NATO SOFA definition of the term "civilian component" to include, among other persons, dependents and "non-Greek persons employed by United States contractors directly serving the United States forces in Greece." See Gov't Reply Ex. 1 at 9 ¶ 4(a) (Annex to

8

the MDCA).[4] The language of the two treaties clearly indicates that, by virtue of his position with Doss Aviation as a contractor "directly serving the United States forces in Greece," Alex qualifies as a member of the "civilian component" and must therefore "respect the law" of Greece.

At issue in this litigation is Article 13 of the Greek constitution, which reads in part:

> 1. Freedom of religious conscience is inviolable. The enjoyment of civil rights and liberties does not depend on the individual's religious beliefs.
>
> 2. All known religions shall be free and their rites of worship shall be performed unhindered and under the protection of the law. The practice of rites of worship is not allowed to offend public order or the good usages. <u>Proselytism is prohibited</u> (emphasis added).

The proselytism prohibition is the basis of the Navy's cease and desist letter to plaintiff. "Proselytism" is defined in the Greek statute criminalizing the practice as "any direct or indirect attempt to intrude on the religious belief of a person of a different religious persuasion (eterodoxos), with the aim of undermining those beliefs, either by any kind of inducement or promise of an inducement or moral support or material

---

[4] Similarly, the NATO SOFA defines "civilian component" as "the civilian personnel accompanying a force of a Contracting Party who are in the employ of an armed service of that Contracting Party, and who are not stateless persons, nor nationals of any State which is not a Party to the North Atlantic Treaty, nor nationals of, nor ordinarily resident in, the State in which the force is located." NATO SOFA Art. I § 1(b).

assistance, or by fraudulent means or by taking advantage of his inexperience, trust, need, low intellect, or naivety."
See Kokkinakis v. Greece, 260 Eur. Ct. H.R. ¶ 16 (1993) (quoting Greek Law Nos. 1363/1938 § 4 and 1672/1939 § 2).

In its status report, the Navy has relied upon Kokkinakis v. Greece, in which the European Court of Human Rights reviewed Greek case law interpreting the meaning of "proselytism." As explained in one cited case, as a general matter, "any determined, importunate attempt to entice disciples away from the dominant religion by means that are unlawful or morally reprehensible" is considered proselytism, though mere spiritual teaching is not included. Id. ¶ 17. Distribution of religious literature appears to be a gray area: handing out books door to door or in the street has not been considered proselytism, whereas distributing religious literature to "illiterate peasants" or "young schoolchildren" was deemed prohibited proselytism. See id. ¶¶ 18, 20. In addition to this case law, the Navy offers anecdotal accounts of other arrests and prosecutions for proselytizing in Greece, citing to news and United States Department of State reports. See Def.'s Status Report at 11-12. In two of the three examples, the accused was ultimately acquitted, and in the third, the defendant was sentenced to four months imprisonment and a fine. Id. Although an element of pressure appears to characterize successful

10

prosecutions for proselytism, the applicability to plaintiff of the wide array of case law on the subject is far from clear, particularly given the variety of activities and services apparently provided by plaintiff's ministry. Whether his conduct constitutes proselytism under Greek law is a close question, and one the Court need not decide, as discussed further below.

C. <u>Deference to Military Decision-making</u>

The Navy argues that the cease and desist order should be upheld "given [the Navy's] duty [under international agreements] to prohibit activities which *could* be construed as violating host nation laws before a violation occurs," especially in light of the traditional deference given to military decision-making regarding its own affairs. <u>See</u> Def.'s Status Report at 13 (emphasis in original). Courts have long accorded substantial deference to military decision-making. It is well-settled that

> [w]hile the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it.

<u>Parker v. Levy</u>, 417 U.S. 733, 758 (1974). The Fourth Circuit has similarly emphasized the "great deference" owed to military decisions in light of civilian courts' lack of competence in the

11

area of military affairs. See Berry v. Bean, 796 F.2d 713, 716 (4th Cir. 1986); see also Rostker v. Goldberg, 453 U.S. 57, 65 (1981) (noting that "the lack of competence on the part of the courts is marked" in the area of regulating the military).[5]

In recognition of the "traditional reluctance of courts to interfere in internal military decisions," the Fourth Circuit has adopted a two-step test to determine whether the actions of military officials are reviewable. Williams v. Wilson, 762 F.2d 357, 359 (4th Cir. 1985). The Court must first make a threshold determination that there is "(a) an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations, and (b) exhaustion of available intraservice corrective measures." Id. (quoting Mindes v. Seaman, 453 F.2d

---

[5] Plaintiff's status as a civilian does not alter the deference due the Navy's decision in this case. As a contractor for the military, plaintiff's conduct is explicitly covered by the NATO SOFA and the MDCA. In other contexts, courts have deferred to military decisions that affect civilians both associated with the military and not. For example, in upholding the male-only draft against an equal protection challenge, the Supreme Court explained that "Congressional judgments concerning registration and the draft are based on judgments concerning military operations and needs,...and the deference unquestionably due the latter judgments is necessarily required in assessing the former as well." Rostker v. Goldberg, 453 U.S. 57, 68 (1981). The Fourth Circuit has also held that a base commander's authority to exclude a civilian from base "is limited only by the requirement that the officer not rely on grounds that are patently arbitrary or discriminatory." Berry v. Bean, 796 F.2d 713, 716 (4th Cir. 1986).

197, 201 (5th Cir. 1971)).[6] After these threshold requirements have been met, the Court must balance four factors:

> (1) the nature and strength of the plaintiff's challenge to the military determination; (2) the potential injury to the plaintiff if review is refused; (3) the type and degree of anticipated interference with the military function; (4) the extent to which the exercise of military expertise or discretion is involved.

Id. The Fourth Circuit later went on to hold that "federal civilian courts are without power to review actions of military authorities where the interference with the military function would be such as to seriously impede the military in the performance of vital duties." Scott v. Rice, 1993 U.S. App. LEXIS 24641, at *6 (4th Cir. 1993) (quoting Mindes, 453 F.2d at 201-02) (internal quotation marks and alterations omitted). "With equal, if not stronger force, matters related to foreign policy are rarely proper subjects for judicial intervention." Oram v. Dalton, 927 F. Supp. 180, 184 (E.D. Va. 1996).

All of these considerations point strongly to affording deference to the Navy's cease and desist letter in this instance. As to plaintiff's First Amendment claim, "when

---

[6] Here, the Navy does not contest that Alex has sufficiently "alleged that there has been a deprivation of a constitutional right and an exhaustion of intra-service remedies." Def.'s Mem. at 13. It is not clear what administrative remedies were available to plaintiff as a contractor for the Navy. Alex appears to have contested the validity of the cease and desist letter with Staff Judge Advocate Gonzales and subsequently sought EEO counseling and pursued an EEO claim through the appellate stage.

evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." Goldman v. Weinberger, 475 U.S. 503, 507 (1986). The Supreme Court's decision in Goldman is particularly instructive in this case. There, an Orthodox Jewish airman challenged an Air Force regulation which prohibited wearing of headgear indoors, including yarmulkes. The plaintiff argued that the rule violated his First Amendment right to exercise his religion. The Court upheld the regulation as constitutional, specifically rejecting the airman's argument that the military had not made a sufficient showing that wearing a yarmulke would undermine discipline. The court held instead that "[t]he desirability of dress regulations in the military is decided by the appropriate military officials, and they are under no constitutional mandate to abandon their considered professional judgment" and that the challenged provisions "reasonably and evenhandedly regulate dress in the interest of the military's perceived need for uniformity." Id. at 509-10.[7]

---

[7] Goldman was superseded by 10 U.S.C. § 774(a)-(b), which permits members of the military to "wear an item of religious apparel while wearing the uniform of the member's armed force," unless the Secretary prohibits the practice because "the wearing of the item would interfere with the performance of the member's military duties" or because "the item of apparel is not neat and

14

In Alex's case, the military's stated need to ensure that military and associated civilian personnel abide by the laws of Greece in compliance with the United States' international obligations is a real and serious concern. There is no evidence that the Navy's proffered justifications for its decision are pretextual or otherwise disingenuous; rather, the evidence produced during discovery establishes that the Navy has not improperly targeted plaintiff because of his particular religious beliefs nor has it singled him out from other personnel engaging in public religious activities. To the contrary, Captain McDonough avers that he was not aware of the names of any other individual participants in plaintiff's ministry and the Navy issued a general order to all sailors prohibiting their involvement. McDonough Decl. ¶ 2; Hansen Decl. ¶¶ 2, 5. See also Oram, 927 F. Supp. at 185 (holding that the military's decision prohibiting a military dependent from practicing law out of his on-base residence was "not arbitrary or discriminatory in any way" because it was based on a treaty with the host nation and agency rules).

Whether plaintiff's conduct does or does not definitively qualify as "proselytism" under Greek law is ultimately beside

---

conservative." Although Congress has now statutorily permitted the wearing of religious apparel, the Court's constitutional holding in Goldman remains unaltered, i.e., military prohibitions on such apparel do not violate the Constitution.

15

the point. The Navy is entitled to err on the side of caution so as to ensure a successful mission in Greece. As in Goldman, the Navy has "reasonably and evenhandedly" made a determination based on its perceived needs and obligations, and is "under no constitutional mandate to abandon [its] considered professional judgment." Goldman, 475 U.S. 509-10. Indeed, a "commanding officer must be afforded substantial latitude in balancing competing military needs and first amendment rights." Carlson v. Schlesinger, 511 F.2d 1327, 1332 (D.C. Cir. 1975).[8] Here, the Navy's determination that plaintiff's conduct *may* violate Greek law and threaten host nation relations was entirely reasonable in light of the public religious nature of plaintiff's activities and the unsettled definition of proselytism under Greek and European Union law. By seeking the advice of a JAG officer as well as a Greek attorney, the Navy made a reasonably well-informed decision that plaintiff's activities impermissibly bordered on illegality. The Court thus agrees with the Oram court's caution, that it should "be extremely hesitant to interfere with [the Navy's] responsibility to ensure [] command decisions do not violate either the express terms or the spirit of international agreements by which [the host nation] permits

---

[8] Although the Carlson court addressed military decision-making in combat zone situations, its reasoning is equally applicable here, where the military takes action consistent with its view of its international obligations and the law of the host country.

the continued presence of U.S. forces." <u>Oram</u>, 927 F. Supp. at 186.

For the same reasons, the degree of anticipated interference with the military function due to plaintiff's religious activities is significant, as the Navy's failure to meet its obligations under the SOFA could considerably jeopardize host nation relations. Although plaintiff argues that his group has received a positive reception from the local community and that Greek authorities have never sought to end his ministry, given the close question as to the definition of proselytism, the Navy's concern with potential violations of Greek law is reasonable. Moreover, there is no guarantee that future Greek officials will take such a permissive approach to plaintiff's ministry or to others like it. As to the third <u>Williams/Mindes</u> factor, compliance with international treaties and maintaining positive relations with the host nation are unquestionably within the sphere of military discretion. As Chaplain Hansen averred, the Xania government and religious community expect considerable involvement of the command when organizing public religious events, even when participation in such events is limited to members of the NSA Souda Bay community. <u>See</u> Hansen Decl. ¶ 3. How to appropriately navigate the expectations of the Greek government and public so as to

17

promote the Navy's mission is not a proper subject for second-guessing by courts.

In contrast, although plaintiff's ability to engage in public religious demonstrations is certainly curtailed by the cease and desist letter, he still retains many avenues to practice his religion and engage in activities similar to his current ministry. Of course, the cease and desist letter does not prohibit him from private worship, nor does it prohibit all public religious activities, but merely requires pre-clearance from the command. Moreover, the Navy maintains that it encourages its personnel to engage in community service activities, suggesting that plaintiff could continue to distribute food and clothing to the needy without the religious overtones currently employed, so long as his conduct does not jeopardize the Navy's status in Greece.

### III. CONCLUSION

Considering all of the foregoing factors, the Court will defer to the Navy's decision and uphold the cease and desist letter. Accordingly, defendant's motions will be granted and this civil action will be dismissed by an Order to accompany this Memorandum Opinion.

Entered this 20th day of June, 2012.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge